William H. Dyckman, Respondent, *v.* Jose Valiente and others, Appellants.

To enable a part owner of personal property to maintain an action against his co-owners, for the conversion of the property, it is not necessary that he should show that the property has been destroyed by them. It is enough if it appear that they have sold it as their own exclusive property, ignoring his right to any share in it.

And this, notwithstanding the fact that he has a right of action against the purchaser for the conversion, if he should sell or deliver the property as his own. Foster, J.

If the exact interest of the plaintiff in the property and the exact amount which he was entitled to recover of his co-owners could be determined without an accounting, the appropriate remedy would be at law; but where such is not the case and an accounting is necessary, a court of equity has jurisdiction of the cause.

In all cases where it is necessary that an accounting should be had to ascertain the rights of part owners of a ship, equity has jurisdiction. Foster, J.

Accordingly, where the plaintiff, in conjunction with some of the defendants, had procured the construction of a steamship under an understanding that a company was to be formed to own the vessel and run her when built, and it was agreed that they should respectively each subscribe for a certain number of shares, into which the stock was to be divided, and pay the amount of such subscriptions toward the construction of the steamship; and the company was organized, the plaintiff and the said defendants did subscribe for a certain number of shares respectively, and paid a portion of the said subscriptions, which were applied to the construction of the ship; and subsequently the plaintiff having failed to pay the remainder of his subscription, and the said defendants also not having paid in full, the said defendants obtained a loan from a capitalist (also a defendant), and mortgaged the ship to him as security, formed another company, of which he was made president, to which the plaintiff was not admitted as a shareholder, and to which the ship was transferred, as representing the whole capital stock of the new company, a transfer never assented to by the plaintiff, and the vessel was subsequently transferred by the new company at a large profit; in an action brought by the plaintiff, against his original associates, the mortgagee of the ship, and president of the new company, and against the new company, praying that his rights as a part owner should be declared, and for an accounting.—*Held*, that the action could be maintained; that the plaintiff was entitled to such share of the ship, and of its proceeds, as the amount contributed by him bore to the amount contributed by him and all the other parties together, to the cost of the

vessel, there first being deducted from the proceeds of the ship, such sum, as would equal the amount of money and interest actually borrowed to complete her, and all other expenses of her equipment when sold.

*Held* further, that if the original co-owners, and their confederates in the new company, had actually sold the ship at a price greater than that at which she was taken by them, then the plaintiff's share was to be of the proceeds of that sale, in the same proportion, and subject to the same deductions.

(Argued March 29th, 1870; and decided June 23d, 1870.)

APPEAL from a judgment of the General Term of the Supreme Court in the first district, reversing a judgment of the Special Term, which dismissed the complaint, and ordering a new trial.

The complaint alleged that the defendant, Joaquin Baralt, in behalf of himself and others, who are defendants, in the year 1860, proposed to the plaintiff to organize a steamship company to carry freight and passengers between New York and Cuba; and that for that purpose, it was agreed that the plaintiff should, in his own name, contract with the firm of Boardman, Holbrook & Co., for the building of a steamship for them; that the company should thereupon be organized, and the steamship, when completed, should be conveyed to the company.

That the plaintiff, on the 15th of September, 1860, made the contract with Boardman, Holbrook & Co., for building the ship, to cost $120,000.

That Boardman, Holbrook & Co., made a net contract with Jeremiah Simonson to build the hull of the ship for the sum of $51,000, the performance of which by Boardman, Holbrook & Co., the plaintiff guaranteed.

That in further pursuance thereof, the plaintiff and Baralt, Boardman, Holbrook and others, organized " The New York and St. Jago Steamship Company," by filing on the 1st of October, 1860, a certificate under the general law for incorporating steamship companies; that to complete the organization of that company, a subscription list of the stock of the company was subscribed by the plaintiff, by the firm of

Valiente & Co. (composed of the said Baralt and the two defendants, Valiente), the said firm of Boardman, Holbrook & Co., and by the said Baralt, as attorney for numerous other parties (who are defendants), residing in Cuba; by which it appeared that Boardman, Holbrook & Co., subscribed for $20,000 of the stock; Valiente & Co. for $30,000; W. H. Dyckman, the plaintiff, for $13,000; and the residue of the subscribers in smaller amounts; and that all the subscribers, except the plaintiff and Boardman, Holbrook & Co., resided in Cuba.

That during the building of the steamship, the plaintiff received from the firm of Valiente & Co. various remittances of money for themselves and the other subscribers on account of their subscriptions, all of which the plaintiff paid over to Boardman, Holbrook & Co., on account of the contract for building the ship; that the plaintiff paid to Boardman, Holbrook & Co., of his own money, $3,250 on account of his subscription to the stock of said company, and his interest as part owner in the ship; that he had also disbursed and paid out in and about the construction of the ship, and in and about the affairs of the company $1,348.95, and that by virtue of such payments, plaintiff was part owner in the ship, and entitled to an interest therein, proportioned to the amount of these payments.

That the plaintiff had contributed to the capital of the company, less than the amount of his said subscription, and which had been assented to by Baralt, and the other subscribers. That the ship was then completed, and was called the *Santiago de Cuba;* that some amount toward her construction was due and unpaid, both to Boardman, Holbrook & Co., and to Simonson, on account of the building contract.

That the defendants in the action have united together to frustrate the plan on which the ship was built, and to deprive the plaintiff of his rights, and that they refuse to recognize The New York and St. Jago Steamship Company.

That Baralt and the firm of Boardman, Holbrook & Co., claiming ownership in the whole ship on the 18th June, 1861,

mortgaged the whole ship to the defendant Juan C. De Mier, to secure $35,000 alleged to have been loaned by De Mier to Baralt.

That the defendants had caused the ship to be registered in the name of the Cuba and New York Steamship Company, a new company which the defendants had organized, and to which they conveyed, or caused to be conveved the ship. That that company were about to issue stocks to Baralt and his confederates, to the exclusion of the plaintiff, for the value of the ship. That the ship was worth much more than her cost, and that the defendants, De Mier, Baralt and Board-man were about to remove the ship to Cuba.

The complaint prayed that an account be taken of the cost of the ship and of the various contributions thereto; that the plaintiff's right might be ascertained and declared; that the ship might be conveyed to the company first organized; or, that the ship might be sold and its proceeds distributed. And it contained a general prayer for relief.

The defendants consist of the subscribers to the stock of the corporation organized by the plaintiff, including Baralt, and Boardman, Holbrook & Co.; of De Mier, the mortgagee of the ship; of The Cuba and New York Steamship Company, being the new company organized by the defendants; and one Joseph Belknap, connected with the organization of that new company.

All the subscribers to "The New York and St. Jago Steamship Company," excepting Boardman, Holbrook & Co., put in a joint answer, in which they denied that the plaintiff paid Boardman, Holbrook & Co. $3,250 on account of his subscription to the stock, but they said that the plaintiff had always claimed to be a creditor of the ship and her owners for that sum and the said sum of $1,348.95. They denied that the plaintiff was a part owner of the ship, or entitled to an interest in it. They denied that Baralt or any one assented to a diminution of plaintiff's subscription, but that the plaintiff had violated his agreement in that respect. They denied that anything remained due to Simonson, or that the plaintiff

paid to Boardman, Holbrook & Co. all the sums of money received by him from Valiente & Co. and others. They denied that they had united to frustrate the original plan, but alleged that the plaintiff had refused to pay over any part of his subscription; claiming that the moneys advanced by him constituted a debt due by the owners of the ship, and that he had thereby compelled the defendants to organize the new company, which company then held the ship and was the true and lawful owner thereof.

Boardman, Holbrook & Co. put in a joint answer exactly like the foregoing.

The defendant, De Mier, answered, admitting the mortgage executed to him; that the defendants had caused the ship to be registered in the name of, and conveyed to, the Cuba and New York Steamship Company; and that he, Baralt and Boardman, were about to remove the ship to Cuba; and he denied that the stock in the new company had been issued to Baralt and his confederates; that anything was due to Simonson; that the plaintiff had then or ever had any interest in the ship and stock of the company, and any knowledge or information of other matters alleged in the complaint.

The Cuba and New York Steamship Company put in an answer, averring that it was the sole owner of the ship, and that on the day of the commencement of the action, the ship was about to sail for Cuba, and they put in issue the residue of the complaint.

Belknap answered, alleging that his name was used in the organization of the new company, and that he made oath to some paper connected therewith, and he put in issue the rest of the complaint.

On the trial of the issue, the plaintiff proved that a large number of individuals residing in Cuba (all of whom are defendants in the action), on the 6th day of June, 1860, executed an article of agreement with each other, and a power of attorney to Baralt, for the purpose of forming a company in New York to furnish a steamer to establish steam commu

nication between New York and Cuba, with a capital of $100,000, in transferable shares of $1,000 each, to be increased to a larger amount, if the majority of the subscribers should agree to it.

The agreement and power provided, among other things for the time of payment of installments of the shares; the amounts of subscriptions to be taken in Cuba and in New York respectively; the appointment, powers, duties and compensation of agents of the company, who were to be consignees of the vessel; that those agents would keep separate accounts of the company's business, and that the books containing them would at all times be exhibited to any "*partner*" desiring it; for an annual distribution of the net profit of the enterprise, and for a reserved fund, for building additional vessels, by the application of the reserve fund and the issue of new shares. That the duration of the company should be nine years, which might be prolonged by the vote of two-thirds of the capital subscribed, with authority to Baralt, with the agent he might select, to put the company in motion.

In June, 1860, Baralt came to New York and presented to the plaintiff the written agreement and power of attorney, and entered into negotiations with him to carry out the project. Boardman, Holbrook & Co. took part in the negotiations, in which Baralt acted for himself, his partners and his constituents, under the power. In pursuance thereof, the plaintiff, in his own name, entered into an agreement with Boardman, Holbrook & Co., dated the 15th of September, 1860, for the building of a steamship by the latter, for the sum of $122,000, payable twenty-five per cent on the 1st of November, 1860; twenty-five per cent on the 1st of January, 1861; twenty-five per cent on the 1st of March, 1861; provided the vessel should then be successfully launched, and the balance on delivery of the ship ready for sea. The agreement provided that a trial trip of the vessel should be successfully made before the delivery; that the expense and risks and marine insurance of the trial trip should be for the

account of Boardman, Holbrook & Co., and that the ship was to be insured on account of Boardman, Holbrook & Co. It further provided that the payments, under a sub-contract with the builders of the hull, should be guaranteed by the plaintiff, who should make those payments direct to the builders of the hull.

At the same time, Boardman, Holbrook & Co. entered into a contract with the plaintiff, agreeing, in consideration of the said contract for building the ship, and of the sum of $2,000 paid by the plaintiff, to take an interest in the ship, to the amount of $20,000, in the cost thereof; for which amount, Boardman, Holbrook & Co., agreed to subscribe for stock in a company to be organized, or to be interested in a partnership for that purpose; if it should be deemed best to establish such partnership, the amount of the $20,000 to be deducted ratably from the several installments, payable under their contract for building the ship; they also agreed that the plaintiff should be the agent of the ship for the city of New York, upon the terms agreed upon between the plaintiff and the other owners or stockholders of the ship; they also agreed to make a deduction of *two and one-half per cent*, from the price of the ship, to be allowed as a commission to the plaintiff, and to be by him allowed to the owners of the ship. And, thereupon, Boardman, Holbrook & Co., on the 16th day of September, 1860, contracted with J. Simonson to build the hull of the ship for the sum of $51,000; and the plaintiff, in pursuance of his covenant with Boardman, Holbrook & Co., guaranteed the payment to Simonson of the $51,000.

Subsequently thereto, and in the month of October, 1860, in pursuance of such negotiations, it was agreed to form a company; and in October, 1860, the company was formed under the general laws of this State, by filing a certificate of incorporation, subscribing to the stock, and appointing the officers. The certificate was for the incorporation of " *The New York and St. Jago Steamship Company;*" and the certificate of incorporation, dated October 1, 1860, was subscribed by the plaintiff, by Baralt, Boardman, Holbrook &

Co., and others, and it appointed directors, among whom was the defendant Boardman, and the plaintiff; and the capital of the company was $120,000, and its objects the same as those expressed in the aforesaid agreement and power of attorney to Baralt. The subscription list to the stock of the company, was subscribed by the plaintiff for thirteen shares, of $1,000 each; by Boardman, Holbrook & Co., for twenty shares, of $1,000 each; by Baralt, for fifty-seven shares, of $1,000 each, as attorney for the persons who subscribed the said agreement and power of attorney to him; and as attorney for Felix Fraser, Antonia Colas, and Manuel de la Torre; and by Valiente & Co., for thirty shares, of $1,000 each. The plaintiff was appointed agent of the company in October, 1860, and the Cuban subscribers paid their subscriptions through the Cuban house of Valiente & Co., who remitted the same to the plaintiff, and he paid the remittances to the. builders of the ship; Boardman, Holbrook & Co. paying their subscriptions by deducting their quota from the cost of the ship.

When the plaintiff signed the contract with Boardman, Holbrook & Co. for building the ship, he paid them the $2,000, being the sum mentioned in one of the contracts, which he considered as paid on account of his subscription toward the ship and toward the capital stock. On the first of November, 1860, when the first installment of twenty-five per cent on the stock was payable to the builders of the ship, amounting to the sum of $25,112.50, the plaintiff paid to the builders $23,112,550, making, with the aforesaid $2,000, the exact amount due on that day. These payments were made up of the amount of one-quarter of the plaintiff's subscription of $13,000 to the stock, being $3,250 (including the said $2,000) paid with the plaintiff's own money; an additional sum of $138.97 of the plaintiff's own money, and all the money theretofore received by the plaintiff from the Cuban subscribers; and all these payments of his own money were intended by the plaintiff as payment on account of the subscription made by him to the stock of the company. He

had also, with the approval of Baralt, made various other disbursements for the ship and for that company amounting to over $1,000; and he intended that these also should gc against the subscription made by him to the stock of the ship These various payments made by the plaintiff, and some sub-sequent ones made by him to the builder, after crediting all the remittances received by him from the other subscribers to the stock, amounted, with interest to January 1, 1861, tc the sum of $4,598.95. The plaintiff continued to act as agent for the company until July, 1861.

In January, 1861, the plaintiff informed Baralt, who was then in New York, that it was doubtful if he could continue the payment of his subscription of $13,000 to the stock; and at about the same time he made a similar statement to Board-man. Baralt expressed to him the opinion that he could arrange the difficulty on his return to Cuba. After his return to Cuba, Baralt wrote to the plaintiff saying: " On being informed of the deficiency which results in the capital, from your not being able to continue in the payment of the $9,000 remaining on your shares, some of the principal stock-holders present took said shares with which our common capital is completed and a difficulty obviated which seemed so great in New York." And he subsequently made a like oral declaration to the plaintiff.

The other subscribers to the stock failed to pay their sub-scriptions when due, and were still in arrears in June, 1861. In June, 1861, Baralt asked the plaintiff for an account of the moneys he had contributed, and he gave Baralt the account, amounting to $4,598.95, already referred to.

In June, 1861, Baralt told the plaintiff, as a reason for the formation of a new company, that as he, Baralt and others, had not been able, up to that time, to pay the builders of the ship in full, by paying their quota of subscription, a loan upon the vessel was necessary, and that the party making the loan, would of necessity, in order to secure himself, become president of the new company. He also told the plaintiff, that he wanted liberty of action in regard to the formation

of the second company; and the plaintiff replied to Baralt, that if he would do what was right, he would put no obstacle in his way; telling him at the same time that the balance shown by the account he had given Baralt of $4,598.95 due December 31, 1860, must be considered to represent plaintiff's interest in the ship. In the conversations of the plaintiff with Baralt, and with the others interested in the ship, he always made the payment to him of the balance, a condition of his relinquishing all interest in the ship. In June, 1861, Baralt, for the first time, objected to the plaintiff being interested in the ship. On the 15th day of June, 1861, the defendant, Baralt, executed to the defendant, De Mier, a mortgage on six-sevenths part of the ship to secure the payment of $35,000 in ninety days, reciting in the mortgage, that the ship had never been registered or enrolled, and that Boardman, Holbrook & Co. owned the other seventh part of the ship; and the defendant Boardman was the subscribing witness to the mortgage.

On the 11th day of July, 1861, the defendants organized the second company, being the "Cuba and New York Steamship Company," with a capital of $180,000.

On the 11th day of July, 1861, the directors of the new company, including the defendants, De Mier, Boardman, Valiente and others, held the first meeting of the board of directors, and appointed the defendant, De Mier, president of the new company, and *resolved*, that the ship be accepted as the full amount of the capital stock of the company, $180,000. The board then adjourned to the 13th of July, aforesaid, but thereafter never transacted any business as a board.

The new company was formed without the assent of the plaintiff, and he never assented to the transfer of the ship to the company.

On the 13th day of July, 1861, Simonson, the builder of the hull, gave a builder's certificate, stating that he had built the ship for account of the new company, the Cuba and New York Steamship Company. On the 17th day of July, 1861, the defendant, De Mier, as president of the new company

took out a register for the ship, De Mier making oath that the stockholders of that company were the only owners of the ship. The answer did not deny that the ship had been conveyed to the new company, or that the plaintiff's advances had never been paid; or that he had been excluded from all interest in the ship, but claimed that the new company was the sole owner thereof.

The plaintiff's counsel offered to prove that the ship had been sold without his knowledge or consent, which was objected to as irrelevant, and the court excluded the testimony and the plaintiff's counsel excepted.

The counsel for the plaintiff offered to prove the amount the subscribers to the stock, other than the plaintiff, were in arrears at different times, which was objected to as irrelevant. The court excluded the testimony and the plaintiff's counsel excepted.

The counsel for the plaintiff offered to prove that the defendant, Baralt, and his confederates, had sold the ship to the United States government, which was objected to as irrelevant. The court excluded the testimony and the plaintiff's counsel excepted.

The plaintiff's counsel then rested his case.

"The defendant's counsel then moved to dismiss the complaint on the ground that the plaintiff had neither stated a cause of action in his complaint, nor proved any on the trial. The plaintiff being a part owner, no action would lie against his co-owners, as no conversion or destruction of the vessel had been proven; that the owners of the ship were tenants in common, and no act had been alleged or proven that would entitle the plaintiff to the equitable interposition of the court: *And the court being of that opinion*, the plaintiff's counsel then asked permission of the court to offer further evidence, namely, to show by reading in evidence the deposition of the defendant, Baralt, taken in this action on behalf of the defendants, that the defendant, Baralt, agreed to pay the plaintiff the amount of plaintiff's account, if the plaintiff would consent to relinquish his agency and interest in the ship, and consent

to the new arrangement by which plaintiff was excluded from an interest in the ship, and'that plaintiff complied with these conditions; but the court refused to receive the evidence on the ground that it was irrelevant to the complaint, to which decision the counsel for the plaintiff excepted."

And thereupon, the court, on the motion of the defendant's counsel, dismissed the complaint with costs; to which decision the counsel for the plaintiff excepted. And thereupon, on such decision, judgment was entered against the plaintiff and in favor of the defendants, dismissing the complaint with costs, to which decision and judgment the plaintiff excepted.

From which decision and judgment the plaintiff appealed to the General Term, where the judgment of the Special Term was reversed and a new trial ordered. And the defendants appealed therefrom to this court pursuant to art. 2 of sec. 11 of the Code.

The case in the court below is reported in 43 Barb., 131.

*Charles Tracy* for the appellants.

*Edmund Randolph Robinson* for the respondent.

Foster, J. I concur, in the main, in the opinion of Sutherland, J., in the court below, in favor of the new trial. But it was claimed by the counsel for the defendant on the trial, and the court so decided, " that the plaintiff was, as shown by the proof, a part owner of the ship, and that therefore the sale of it without his assent by the other part owners, under the circumstances proved, was not a conversion of it, it not being destroyed; or at all events not such a disposition of it as entitled him to equitable relief." I think upon authority it is well settled, that the disposition of the ship made by the other part owners was a conversion, for which the plaintiff could, as *part owner*, maintain an action to recover his interest therein.

It is not necessary for one part owner in an action against his co-owners for a conversion, to show that the property has

been destroyed; but it is enough, if it appear that they have sold it as their own exclusive property, ignoring his right to it. (*Weld* v. *Oliver*, 21 Pick., 559, 563.) Or he may, in case the purchaser should also sell and deliver the property as his own, maintain trover against such purchaser for the subsequent conversion. (Id.) In that case the property in question was a ship, and the decision is precisely in point to show that in such a case as this, an action can be maintained. The same doctrine is contained in Collyer on Partnership, p. 1019, and Abbott on Shipping, marginal paging 100, and note 1, near the end of the page, and is supported by several decisions in our courts. (*Wilson* v. *Gibbs*, 3 J. R., 175, 178, 179; *Hyde* v. *Stone*, 9 Cowen, 230, 232; *Gilbert* v. *Dickinson*, 7 Wendell, 449, 450; *Farr* v. *Smith*, 9 Wendell, 338; *Mumford* v. *McKay*, 8 Wendell, 442, 444; *White* v. *Osborn*, 21 Wendell, 72, 75; 2 Kent's Com., 5th ed., 351, note d.)

There is no doubt, then, that upon the pleadings and proofs a cause of action existed in favor of the plaintiff against the defendants for the conversion of the ship; and the question is whether it should have been an action at law for the conversion, or whether, under the circumstances of the case, the more appropriate remedy was a suit in equity. If the exact interest of the plaintiff in the ship, and the exact amount which he was entitled to recover of the defendants could be ascertained and determined without an accounting, the appropriate remedy would be at law. As, for instance, if he owned one-half, or one-fourth of it, there would be no difficulty, unless there were charges upon it remaining unpaid, in dispensing complete justice in an action of trover. But it is quite clear, as well on the averment of the complaint as upon the testimony, that the rights of all the parties can be justly determined only in a suit in equity.

It is true, that upon the evidence as it stands, and which, under the present appeal, wherein if the order of the court below is affirmed, it is final, it is established that the plaintiff has paid $4,598.95, on the 1st of January, 1861.

It also appears, that the contract price of the ship was

$122,000, but whether to complete it, actually cost more or less than that amount, is entirely uncertain upon the evidence, and cannot be ascertained without an accounting; and what is quite as material, it will require an accounting to ascertain the amounts paid by the several subscribers to the stock of the steamship company which was first incorporated, and for whose use it was contracted to be built. Because the plaintiff's interest in the vessel would be the proportion which his $4,598.95 bore to the whole amount paid by all the subscribers, and not the proportion which the $4,598.95 bore to the whole cost of her; if borrowed money was used in payment, for if a profit was made on money borrowed and used in the construction, he would have a right to share in that profit in the proportion, which, what he paid in, bore to what was actually paid in by himself and all the others of the joint owners. And, therefore, to arrive at a correct result, as to the respective interests, an account must be taken of what all the other subscribers paid in, and what further amount was borrowed and actually used in the construction, and also for how much the vessel at any time was actually sold by those who were her original joint owners, or was afterward sold by them and the steamship company which was organized without the consent and to the exclusion of the plaintiff.

This is not a case in which the defendants can claim to limit the plaintiff's recovery to what witnesses will testify to have been the value of the vessel when she was turned over to the "Cuba and New York Steamship Company," of which all the defendants became stockholders, but the plaintiff has a right to treat them as his trustees, and to compel them to account for all the profits which they made out of his property of which, as his joint owners, they assumed the control and disposition, and that too as well after the covenant of the action as before, for equity administers justice to the time of the trial.

It is necessary in such a case as this to ascertain the highest price for which the defendants sold the vessel, also to

ascertain the amount of borrowed money actually used in its construction, to be deducted from the whole amount for which it was so sold, and of the balance, the plaintiff will be entitled to recover of the defendants the proportion thereof which his $4,595.95 bears to the whole amount actually paid in by him and by all the other joint owners upon their subscriptions.

We must assume, for the purpose of holding this to be a proper case for equity jurisdiction, that the ship was sold without the knowledge or consent of the plaintiff; that the subscribers to the stock of " *The New York & St. Jago Steamship Company*," were in arrears at different times in the payment of their subscriptions to the capital stock, and that the defendant Baralt, and his confederates, the other defendants, had sold the ship to the United States for $200,000; for the plaintiff offered to prove each of these statements, and they were severally objected to by defendants' counsel, on the ground that they were irrelevant; which objections were sustained by the court and to each of which the counsel for the plaintiff excepted.

I have no doubt that the testimony contained in each offer should have been admitted, and that the court erred in excluding it.   It was all material and necessary in order to ascertain the true rights of the parties; and until it is ascertained how much the defendants paid, and how much the vessel was sold for, it will be impossible to tell how much the plaintiff is entitled to recover.

This, to my mind, is upon principle so clearly a case for invoking the equity jurisdiction of the Supreme Court, that I consider the citation of authorities to support it is wholly unnecessary.

The rule is, that in all cases, where it is necessary that an *accounting* should be had to ascertain the rights of part owners of a ship, equity has jurisdiction (Parsons on Maritime Law, 103), where it is said : " So it has been the custom for part owners of a ship to bring a bill against each other in equity for adjustment of accounts, in like manner as is done by part-

ners." And in *Mumford* v. *Nicoll* (20 J. R., 611), it was held that where one of two part owners of a ship receives or gets possession of the whole funds of a vessel and of the voyage, he has a right to retain them until he is paid or indemnified for what he has advanced or paid more than his share for outfits, repairs or expenses of the vessel for the particular voyage or *adventure*." The same principle is stated in Willard's Eq. Jur. (104, 506). In 1 Story Eq. Jur. (§ 451), it is said: "The whole machinery of courts of equity is better adapted to the purpose of an account in general; and in many cases, independent of the searching power of discovery, and supposing a court of law to possess it, it would be impossible for the latter to do entire justice between the parties; for equitable rights and claims, not cognizable at law, are often involved in the contest. This is the principle on which courts of equity constantly act by taking cognizance of matters, which, though cognizable at law, are yet so involved with a complex account that it cannot be properly taken at law ; and until the result of the account is known, the justice of the case cannot appear." And cases of account between tenants in common, between joint tenants, between partners, between part owners of ships, and between owners of ships and the masters fall under the like consideration (1 Story's Eq. Jur., § 465).

The complaint having stated facts which showed that for the proper settlement of the rights of the parties, an accounting would be necessary, and the proof having established the necessity therefor, it is not material that the complaint did not in terms pray for an account; for it will be allowed under a general prayer for relief, when the facts stated will warrant it.

The General Term was right in granting a new trial, and its action should be affirmed. But inasmuch as the defendant appealed from the order granting the new trial, the judgment must be final for the plaintiff, and a referee must be appointed to take an account of the original cost of the ship, and whether it was sold by the Cuba and New York Steamship Company, and the price at which

it was sold; and if so sold, that he report in favor of the plaintiff such proportion of the amount of such price, as the said sum of $4,598.95 bears to the whole of such original cost of the vessel. And if such vessel was not sold by the Cuba and New York Steamship Company, that then he take an account of the value of the vessel at the time when it was transferred to the Cuba and New York Steamship Company; and that he report in favor of the plaintiff such proportion of such value of the vessel, as the said sum of $4,598.95 bears to the said original cost of the vessel, with interest thereon from the time of such sale or valuation. And that upon filing the report of the referee, judgment for the amount reported be rendered for the plaintiff, with his costs and disbursements of the action.

EARL, Ch. J., read an opinion for reversal of the General Term on the ground that the action, being to wind up substantially the affairs of a corporation, the corporation should necessarily be a party, plaintiff or defendant, as should all its directors, several of which were not parties to this action.

All the judges (except EARL, Ch. J.) concurring with FOSTER, J., for affirmance.

Order affirmed, and judgment final for the plaintiff, upon the basis of FOSTER's opinion.